FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

20 MAR 19 PM 1:09

CLERK_____
SO. DIST. OF GA.

**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | | |
|---|---|---|
| RETINA CONSULTANTS P.C. DEFINED BENEFIT PENSION PLAN and RETINA CONSULTANTS, P.C., as Plan Sponsor and Plan Administrator, | * * * * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | CV 119-037 |
| | * | |
| R. SCOTT BENJAMIN and SOUTH STATE BANK f/k/a GEORGIA BANK & TRUST, | * * * | |
| | * | |
| Defendants. | * | |

## O R D E R

Before the Court is Defendants R. Scott Benjamin ("Defendant Benjamin") and South State Bank's ("Defendant South State") (collectively, "Defendants") motion to compel arbitration and stay pending arbitration (Doc. 17), Defendant South State's motion to dismiss (Doc. 18), and Plaintiffs Retina Consultants P.C. Defined Benefit Pension Plan ("Plan") and Retina Consultants, P.C.'s ("Plan Sponsor") (collectively, "Plaintiffs") motion to amend complaint (Doc. 22). For the following reasons, the Court **GRANTS** Defendants' motion to compel arbitration and stay pending arbitration.

# I. BACKGROUND

As discussed below, the Court only analyzes Defendants' motion to compel arbitration and stay pending arbitration; thus, the Court lays out the facts as relevant to addressing that motion. In deciding the motion to compel arbitration, "the Court is not limited to the four corners of . . . Plaintiff[s'] complaint." Hearn v. Comcast Cable Commc'ns, LLC, ___ F. Supp. 3d ___, 2019 WL 5305460, at *1 n.1 (N.D. Ga. Oct. 21, 2019) (citing Liles v. Ginn-La West End, Ltd., 631 F.3d 1242 (mem.), 1244 n.5, 1249 n.13 (11th Cir. 2011)). As such, the Court considers evidence outside Plaintiffs' Amended Complaint (Doc. 6). Additionally, "the Court must apply a 'summary-judgment-like' standard to factual disputes on a motion to compel arbitration" and, thus, "will view the evidence in the light most favorable to . . . Plaintiff[s]." Hearn, 2019 WL 5305460, at *1 n.1 (quoting In re Checking Account Overdraft Litig., 754 F.3d 1290, 1294 (11th Cir. 2014)).

## A. The Plan and the Parties

Dr. Ranjit Dhaliwal and Dr. Oksana Demediuk own Retina Consultants, P.C., an ophthalmology surgical clinic in Augusta, Georgia. (Am. Compl., Doc. 6, ¶ 3.) Retina Consultants, P.C. has sponsored the Plan since January 1, 2000. (Id. ¶ 3.) Plaintiffs bring claims relating to the servicing of the Plan. (See generally, Am. Compl.)

2

"The Plan is a defined benefit retirement plan (also called a pension plan) with a final-average-earnings benefit formula that pays retirees a lifetime monthly benefit." (Id. ¶ 3.) According to Plaintiffs, Defendant Benjamin "served as the Plan's investment advisor and as a self-appointed administrative fiduciary since the Plan's effective date of January 1, 2000," until Retina Consultants, P.C. terminated his services in mid-2017. (Id. ¶ 4.) At all relevant times, Defendant South State employed Defendant Benjamin. (Id. ¶ 4.) Plaintiffs state, "Instead of using a trustee, the Plan's assets were held by [Defendant] South State . . . who employed [Defendant] Benjamin, except to the extent the assets were held by MassMutual Retirement Services during a 4-1/2[-]year period from March 2012 until September 2016." (Id. ¶ 9.)

The Plan maintained an investment account ending in 3063 with LPL Financial ("LPL Account 3063"). (See LPL's New Account Form, Doc. 17-2; LPL's ERISA Service Provider Disclosure Form, Doc. 17-4.) In connection with opening LPL Account 3063, on December 13, 2010, Dr. Dhaliwal completed LPL's New Account Form registered to "Ranjit S. Dhaliwal; Retina Consultants Defined Ben; Outside Investments-Retirement." (LPL's New Account Form, at 1.[1])

---

[1] The Court cites exhibit page numbers using the page numbers on the original document where available. When the exhibit does not have original page numbers, the PDF page number supplied by CM/ECF is cited with the initial page omitted if the initial page only notes the exhibit number.

At the top of LPL's New Account Form, the "Rep ID" is "3W9D." (Id.) In the last section that is "For Branch Use Only," "Raymond Scott Benjamin" signed and printed his name as the "Financial Advisor"; Defendant Benjamin's "Rep ID" is "3W9D." (Id. at 4.) Within the "For Branch Use Only" section there are two lines for the "Branch Manager Signature (required)" and "Branch Manager Name (print)." LPL's New Account Form displays apparently stamped information directly below those two lines: "Nikolaos Peroulas HOS E6CD 12/29/2010." According to Defendants, Nikolaos Peroulas is LPL's manager and "HOS" stands for "Home Office Supervision." (Defs.' Reply Supp. Mot. to Compel Arbitration, Doc. 30, at 6.) Plaintiffs do not challenge either assertion.

It appears Dr. Dhaliwal signed LPL's New Account Form on behalf of the Plan and Plan Sponsor as the "Client" on December 13, 2010, directly below language stating:

> I further certify that all of the information provided on this form is true, correct, and complete and that I have received a copy of this form. I agree to notify LPL of any changes to the information on this form. I have reviewed and accept the Master Account Agreement and the predispute arbitration clause in the last section thereof.

(LPL's New Account Form, at 4.)

## B. The Arbitration Agreement

That brings the Court to the "Arbitration Agreement" within LPL's Master Account Agreement, which states, in part:

In consideration of opening one or more accounts for you, you agree that any controversy between you and LPL and/or your Representative(s) (whether or not a signatory(ies) to this Master Account Agreement or Arbitration Agreement), arising out of or relating to your account, transactions with or for you, or the construction, performance, or breach of this agreement whether entered into prior, on or subsequent to the date hereof, shall be settled by arbitration in accordance with the rules, then in effect of the Financial Industry Regulatory Authority [("FINRA")].

(LPL's Master Account Agreement, Doc. 17-3, at 6.)

## C. Alleged Misconduct

Throughout his tenure servicing the Plan, Defendant Benjamin "select[ed] the Plan's service providers." (Am. Compl., ¶ 9.) In 2016, Retina Consultants, P.C. conducted "[a]n actuarial and legal Plan audit," which "revealed that Benjamin selected providers with whom he had personal and/or business relationships, and from whom he obtained referrals to expand his business." (Id.) Furthermore, Plaintiffs allege:

> Benjamin selected investments for the Plan's assets that enriched himself at the expense of the Plan and its participants, which in turn required substantially higher annual contributions that had to be covered by the Plan Sponsor and sometimes had to be paid by loan proceeds to avoid the IRS' assessment of interest and penalties.

(Id. ¶ 14.)

## D. Specific Counts Against Defendants

On these facts, Plaintiffs bring six counts. In the Amended Complaint, each Count refers only to actions of Defendant Benjamin. (See generally, id. at 16-23.) Plaintiffs only tie Defendant South

5

State into the Complaint by alleging Defendant South State failed "to properly supervise and control [Defendant Benjamin's] activities." (Id. ¶ 1.)

The Court also examines whether the Proposed Second Amended Complaint (Doc. 22-1) includes additional allegations against Defendant South State. The Proposed Second Amended Complaint includes more information in the "Factual Allegations" section referring to Defendant South State's conduct. (See generally, Proposed Second Am. Compl., Doc. 22-1, at 4–18.) In Counts I–V of Plaintiffs' Proposed Second Amended Complaint, Plaintiffs mention Defendant South State only by including this line: "At all times herein South State Bank failed to supervise and monitor the actions of [Defendant] Benjamin." (Id. ¶¶ 26 (Count I), 30 (Count II), 33 (Count III), 36 (Count IV), 40 (Count V).) Plaintiff does not mention Defendant South State in the final count, Count VI, which covers statutory attorney's fees. (Id. ¶¶ 41–43.)

## E. Procedural Posture

On March 11, 2019, Plaintiffs filed the original complaint against Defendant Benjamin only. On March 21, 2019, Plaintiffs filed the Amended Complaint naming Defendant South State. Thereafter, Defendants moved to compel arbitration and stay pending arbitration (Doc. 17), Defendant South State moved to dismiss (Doc. 18), and Plaintiff moved to amend the complaint (Doc. 22).

## II. DISCUSSION

The Court must determine which motion to address first. Although Defendant South State filed a motion to dismiss, that does not waive its ability to arbitrate this dispute. See, e.g., Hicks v. Am. United Life Ins., Co., No. CV-10-S-01401-NE, 2011 WL 13233202, at *11 (N.D. Ala. Jan. 19, 2011) ("[N]umerous cases in this circuit have held that a defendant's filing of a motion to dismiss does not waive [its] right to arbitration."). Defendant South State also expressly reserved the right to arbitrate this dispute. (Mot. to Dismiss, Doc. 18, at 1 n.1.) As such, the Court begins by addressing Defendants' motion to compel arbitration and stay proceedings. The Court addresses: (A) Preliminary questions surrounding the motion to compel arbitration; (B) The substance of the motion to compel arbitration; (C) Whether Defendant South State Bank may compel arbitration; and (D) Whether the Court should stay the case pending arbitration.

### A. Preliminary Questions Surrounding the Motion to Compel Arbitration[2]

There is an "emphatic federal policy in favor of arbitral dispute resolution." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985). The Federal Arbitration

---

[2] The Arbitration Agreement discussed herein was allegedly incorporated into an agreement signed by Dr. Dhaliwal on behalf of the Plan and Plan Sponsor and Defendant Benjamin. There is no claim that Defendant South State was a direct party to this agreement. As such, the Court refers to Plaintiffs and Defendant Benjamin as the "Contracting Parties" when discussing the Arbitration Agreement.

Act ("FAA") requires courts to "rigorously enforce agreements to arbitrate." Davis v. Prudential Sec., Inc., 59 F.3d 1186, 1192 (11th Cir. 1995) (quoting Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987)). "[T]he party seeking to compel arbitration has the initial burden of 'producing the arbitration agreement and establishing the contractual relationship necessary to implicate the FAA and its provisions granting th[e] [c]ourt authority to dismiss or stay [the] [p]laintiff[s'] cause of action and to compel arbitration.'" Compere v. Nusret Miami, LLC, 396 F. Supp. 3d 1194, 1199 (S.D. Fla. 2019) (quoting Fantis v. Flywheel Sports, Inc., No. 18-24934-CIV-UNGARO/O'SULLIVAN, 2019 WL 1582957, at *2 n.2 (S.D. Fla. Mar. 11, 2019)). If the party for arbitration meets its burden of production, the burden shifts to the party opposing arbitration to show why the court should not compel arbitration. Bhim v. Rent-A-Center, Inc., 655 F. Supp. 2d 1307, 1311 (S.D. Fla. 2009).

As an initial matter, Defendants have met their burden of showing the FAA governs the Arbitration Agreement at issue in this case because the FAA applies to agreements "evidencing a transaction involving commerce." 9 U.S.C. § 2. The Supreme Court has construed this language broadly, holding that Section Two's "involving commerce" language must be read to extend the Act's reach to the limits of Congress's Commerce Clause Power. Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 268, 277 (1995).

Here, the Arbitration Agreement is within an agreement pertaining to the management of securities and investments; thus, the contract implicates interstate commerce, and the FAA governs. See Belz v. Morgan Stanley Smith Barney, LLC, No. 3:13-cv-636-J-34MCR, 2014 WL 897048, at *5 (M.D. Fla. Mar. 6, 2014) (citing, among others, Grant v. Houser, 469 F. App'x 310, 313 (5th Cir. 2012)).

Before deciding whether arbitration is proper, the Court discusses two preliminary matters: (a) whether the parties must show FINRA Rule 12200[3] has been met, and (b) whether the Court or arbitrators decide questions of arbitrability.

1. FINRA Rule 12200

The Parties dispute whether FINRA Rule 12200 ("Arbitration Under an Arbitration Agreement or the Rules of FINRA") is required to be satisfied and, if so, whether it has been satisfied. In this section, the Court addresses only whether Defendants must show FINRA Rule 12200 has been satisfied.

Defendants cite and distinguish cases supporting their belief that the Court must only examine the text of the Arbitration Agreement as contained within LPL's Master Account Agreement. (See Defs.' Sur-Reply Supp. Mot. to Compel Arbitration, Doc. 41, at 2–3, 3 n.3.) The Court cannot ignore that the Arbitration Agreement

---

[3] The FINRA Rules discussed herein are within FINRA's Code of Arbitration Procedure for Customer Disputes.

incorporates the FINRA Rules.[4] "Because the arbitration agreement incorporates the FINRA rules by reference, those rules must be considered to give full effect to the intent of the parties." Shacknai v. Mathieson, No. CV 08-01025-PHX-FJM, 2009 WL 482561, at *2 (D. Ariz. Feb. 25, 2009) (citing Cox. v. Ocean View Hotel Corp., 533 F.3d 1114, 1122 (9th Cir. 2008)); see also Variable Annuity Life Ins. Co. v. Laferrera, 680 F. App'x 880, 885 (11th Cir. 2017) (stating that the agreements to arbitrate incorporated the FINRA rules when the agreements state the parties agree to submit their claims to FINRA). Cf. Dougherty-Fenn v. Raymond James & Assocs., No. 8:08-cv-1131-T-30TGW, 2008 WL 2761262, at *1 (M.D. Fla. July 15, 2008) (analyzing whether class action was proper under NASD

---

[4] Defendants cite SG Americas Securities, LLC v. AC Scout Trading, LLC, for the proposition that the parties can contract around FINRA Rule 12200. No. 1-16-0436, 2017 WL 2672557 (Ill. App. Ct. June 20, 2017) (unpublished). In SG Americas Securities, the arbitration agreement allowed the Customer to choose the arbitral fora at the time the dispute arose. Id. at *1. The Appellate Court of Illinois found that "nothing in this language . . . evinces a clear intent to incorporate the rules of the arbitration fora into the arbitration provision as substantive conditions expanding or limiting the arbitrability of any particular claim in any particular forum." Id. at *5. The Court distinguishes SG Americas Securities from the present case because the Contracting Parties specifically included the FINRA Rules in their agreement, rather than, after the fact, allowing a party to pick among at least three arbitral foras. Here, the Contracting Parties specifically agreed at the outset that they would submit any controversy to arbitration under the FINRA Rules. See also FINRA Rule 12101(b) ("When a dispute is submitted to arbitration under the Code pursuant to an arbitration agreement, the Code is incorporated by reference into the agreement."). SG Americas Securities also cites Second Circuit cases for the proposition that pre-dispute arbitration clauses can contract around FINRA Rule 12200's requirements. In Credit Suisse Sec. (USA) LLC v. Tracy, the Second Circuit held "a pre-dispute private agreement to arbitrate before a non-FINRA arbitral forum is enforceable," which is inapplicable to the situation presented here. 812 F.3d 249, 254 (2nd Cir. 2016). Here, the Contracting Parties incorporated the FINRA Rules; there is no evidence of their intent to contract around the FINRA Rules.

Rule[5] 13204 before compelling arbitration).  But see Wang v. Bears,
Stearns & Co., No. CV 09-5731-GHK (CTx), 2010 WL 11520541, at *1,
*1 n.2 (C.D. Cal. Jan. 13, 2010), aff'd by 456 F. App'x 670 (9th
Cir. 2011) (noting, but not resolving, uncertainty over when FINRA
Rules are incorporated into an agreement given language of Rule
12101 that the Rules are incorporated "[w]hen a dispute is
submitted to arbitration under the code").  Thus, unless the
arbitrability question has been delegated to the arbitral panel as
discussed in the following section, the Court must determine
whether the Parties are eligible to arbitrate under the
incorporated FINRA Rules.  One such rule is FINRA Rule 12200,[6]
which provides:

> Parties must arbitrate a dispute under the Code if:
>
> - Arbitration under the Code is either:
>
>   (1)  Required by a written agreement, or

[5] The NASD Rules were the predecessors to the FINRA Rules.  "The Securities and
Exchange Commission ('SEC') approved new FINRA Rules, which became effective
December 15, 2008, and apply to all claims filed on or after April 16,
2007. . . .  Authority arising under the NASD Code governs and guides
interpretations of the FINRA Rules to the extent that there is no meaningful
change from the NASD Code."  AXA Distribs. v. Bullard, No. 1:08-CV-188-WKW [WO],
2008 WL 5411940, at *3 n.10 (M.D. Ala. Dec. 24, 2008) (citing Order Approving
FINRA Proposed Rule Changes, Exchange Act Release No. 34-58643, 73 Fed. Reg.
57,174 (Oct. 1, 2008); FINRA, Regulatory Notice 08-57, SEC Approves New
Consolidated FINRA Rules, 2008 WL 4685588 (Oct. 16, 2008)).
[6] FINRA Rule 12101(a) provides: "The Code applies to any dispute between a
customer and a member or associated person of a member that is submitted to
arbitration under Rule 12200 or 12201."  FINRA Rule 12200 governs when
arbitration under the Code is mandatory, while FINRA Rule 12201 allows for
elective arbitration.  Elective arbitration requires, among other things, that
"[t]he parties agree in writing to submit the dispute to arbitration under the
Code after the dispute arises."  Because it is clear the Parties have not agreed
post-dispute to arbitrate, arbitration is only eligible under FINRA if Rule
12200 is satisfied.

(2)   Requested by the customer;

- The dispute is between a customer and a member or associated person of a member; and

- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

Thus, to determine whether the parties agreed to arbitrate the current dispute under the FINRA Rules, it must be decided whether this dispute is eligible for FINRA arbitration under Rule 12200. The question remains whether the Court or arbitral panel makes this determination.

2. Decisions Regarding Arbitrability

According to the Supreme Court, "[I]n the absence of an agreement to the contrary, issues of substantive arbitrability are for a court to decide and issues of procedural arbitrability . . . are for the arbitrators to decide." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 85 (2002); see also JPay, Inc. v. Kobel, 904 F.3d 923, 930-31 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 1545 (2019) (mem.).  Procedural matters presumptively for the arbitrators to decide include "whether prerequisites to arbitration were fulfilled, whether waiver or delay defenses are available, or whether plaintiffs have run into trouble with 'time limits, notice, laches, or estoppel,' and the like."  Jpay, 904 F.3d at 932-33 (quoting Howsam, 537 U.S. at 84-85).  The "two

categories of questions of [substantive] arbitrability — presumptively for the courts to decide — are questions 'about whether the parties are bound by a given arbitration clause' and questions 'about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." Id. (quoting Howsam, 537 F.3d at 84) (footnote omitted).

The presumption in favor of the court deciding substantive arbitrability challenges may be overcome when there is "'clear and unmistakable evidence' that the parties intended the arbitrator to rule on the validity of the arbitration agreement itself." Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship, 432 F.3d 1327, 1331 (11th Cir. 2005) (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). When the parties incorporate into their agreement arbitral rules granting the arbitrator the power to rule on the arbitrability of the dispute, the parties "clearly and unmistakably evince an intent to delegate questions of arbitrability." JPay, 904 F.3d at 937. In JPay, the Eleventh Circuit reiterated that incorporating the American Arbitration Association ("AAA") Rules in an arbitration agreement was sufficient to grant the arbitrator the power to decide questions of arbitrability because the AAA rules "gave the arbitrator 'the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of

the arbitration agreement.'" 904 F.3d at 945 (quoting <u>Terminix</u>,

432 F.3d at 1332 (quoting prior version of Am. Arbitration Ass'n,

Consumer Arbitration Rules R-14(a) (2018); Am. Arbitration Ass'n,

Commercial Arbitration Rules and Mediation Procedures R-7(a)

(2013))).

Here, the Contracting Parties incorporated the FINRA Rules

into the Arbitration Agreement. Under the FINRA Rules, "[t]he

panel has the authority to interpret and determine the

applicability of all provisions under the Code." FINRA Rule 12409.

The Eleventh Circuit addressed whether incorporating the NASD

Rules — predecessor to the FINRA Rules[7] — evidences the parties'

intent to delegate questions regarding the validity of the

arbitration agreement to the arbitral panel. Section 35 of the

NASD Rules is materially similar to FINRA Rule 12409 in that it

states, "[T]he arbitrator must interpret and determine the

applicability of all provisions under the NASD Code." <u>Merrill</u>

<u>Lynch, Pierce, Fenner & Smith, Inc. v. Cohen</u>, 62 F.3d 381, 384

(11th Cir. 1995). In <u>Cohen</u>, the Eleventh Circuit stated:

> [S]ection 35 is not "clear and unmistakable evidence" of
> the parties' intent to allow the arbitrator to determine
> the timeliness of the claim. . . . Section 35 is a
> general contract term which gives the arbitrator the
> power to interpret the NASD Code. . . . We conclude
> that, at most, section 35 creates an ambiguity as to who
> determines arbitrability. Because an ambiguity is
> insufficient to override the presumption that courts
> determine arbitrability, . . . we conclude that the

---

[7] See *supra* note 5.

14

district court must determine whether the dispute between [the parties] is arbitrable.

62 F.3d at 384 (internal citations omitted). Thus, incorporating the FINRA Rules into an arbitration agreement is insufficient on its own to evidence the parties' clear intent for the arbitral panel to determine arbitrability.[8] Having so decided, the Court now determines whether the motion to compel arbitration should be granted.

## B. Substance of Motion to Compel Arbitration

The remaining questions for the Court to answer regarding Defendants' motion to compel arbitration are whether (1) Plaintiff entered into an enforceable, written arbitration agreement under state law and (2) the claims before the Court fall within the scope of that agreement.

---

[8] Plaintiffs' only challenge to the procedural arbitrability of this dispute is that FINRA's time limit under Rule 12206 has not been satisfied. (Pls.' Resp. Opp'n Defs.' Mot. to Compel Arbitration, Doc. 21, at 6.) As stated above, procedural matters such as time limits are presumptively for the arbitrators to decide. Even if not, however, incorporation of the FINRA Rules — which includes FINRA Rule 12206 — evidences the parties' clear and unmistakable intent to delegate questions of time limits to the arbitral panel: "No claim shall be eligible for submission to arbitration under the Code where six years have elapsed from the occurrence or event giving rise to the claim. The panel will resolve any questions regarding the eligibility of a claim under this rule." FINRA Rule 12206(a); see Quality Air Servs., LLC v. DiPippo, No. JFM-12-3338, 2013 WL 693052, at *3 (D. Md. Feb. 25, 2013) ("In any event, FINRA's rules expressly provide that 'the arbitration panel will resolve any questions regarding the eligibility of a claim under this rule.' FINRA [Rule] 12206(a). If the panel determines that any claim asserted by [the] plaintiff is not subject to arbitration because it is time-barred or otherwise, by definition the arbitration agreement does not apply to the claim, and this action may proceed as to it.").

### 1. Enforceable, Written Arbitration Agreement Under State Law

Because the contract at issue here was executed in Georgia, Georgia law applies. See Federated Rural Elec. Ins. Exch. v. R.D. Moody & Assocs., Inc., 468 F.3d 1322, 1325 (11th Cir. 2006); Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1368 (11th Cir. 2005) ("[S]tate law generally governs whether an enforceable contract or agreement to arbitrate exists."). "Under Georgia law, a binding contract requires 'a definite offer and complete acceptance, for consideration.'" Shubert v. Scope Prods., Inc., No. 2:10-CV-00101-RWS, 2011 WL 3204677, at *2 (N.D. Ga. July 27, 2011) (quoting Moreno v. Strickland, 567 S.E.2d 90, 92 (Ga. Ct. App. 2002)).

There are only two challenges to the validity of the Arbitration Agreement. First, Plaintiffs argue that LPL's New Account Form is unsigned by the bank manager. As an initial matter, Plaintiffs seem to believe the bank manager at issue is Defendant South State's bank manager. (Pls.' Resp. Opp'n Defs.' Mot. to Compel Arbitration, at 4; Defs.' Reply Supp. Mot. to Compel Arbitration, at 7.) That is not the case. Defendant South State is not a direct party to this agreement. Rather, the bank manager that LPL's New Account Form refers to is LPL Financial's bank manager. At the time, that was Nikolaos Peroulas. (Defs.' Reply Supp. Mot. to Compel Arbitration, at 6—7.)

Having now determined the correct bank manager, the question remains whether Nikolaos Peroulas signed the agreement. Nikolaos Peroulas "stamped his typewritten name and the date . . . [eighteen] or [nineteen] days after Dr. Dhaliwal placed his signature on the form." (Pls.' Sur-Reply Opp'n Defs.' Mot. to Compel Arbitration, Doc. 34, at 8.) Plaintiff argues that the form required both Nikolaos Peroulas's printed name and signature. As provided, only his printed name is on the form. (Id. at 8-9.) The Court need not address Plaintiffs' challenge regarding the alleged lack of a signature because even if the bank manager failed to effectively sign the agreement, "the Eleventh Circuit holds that a written, but unsigned, arbitration clause, qualifies as a written agreement under the FAA such that this Court can compel arbitration." Johnson v. Charles Schwab & Co., No. 09-CV-81479, 2010 WL 678126, at *2 (S.D. Fla. Feb. 25, 2010) (citing Caley, 428 F.3d at 1369-70); see also First Citizens Mun. Corp. v. Pershing Div. of Donaldson, Lufkin & Jenrette Sec. Corp., 546 F. Supp. 884, 887 (N.D. Ga. 1982). Thus, the potential lack of the bank manager's signature does not preclude the Court from compelling the Contracting Parties to arbitrate this dispute.

Second, Plaintiffs attack the validity of the Arbitration Agreement by stating, "Plain[]tiffs did not receive an executed copy of the executed Client Acknowledgment and Execution form . . . until [they] received Doc. 17 with the form and the

other exhibits to the Affidavit of Thomas Barnet[t]." (Pls.' Sur-Reply Opp'n Defs.' Mot. to Compel Arbitration, at 8.)   Plaintiffs provide no evidence of this.   Furthermore, directly above Dr. Dhaliwal's signature is a clause reading:

> I further certify that all of the information provided on this form is true, correct, and complete and that I have received a copy of this form.   I agree to notify LPL of any changes to the information on this form.   I have reviewed and accept the Master Account Agreement and the predispute arbitration clause stated in the last section thereof.

Here, Dr. Dhaliwal signed that he received a copy of the Arbitration Agreement and there is no evidence in the record contradicting that.   As such, Plaintiffs' argument fails.   After finding the above, the Court finds the Arbitration Agreement is valid.   The question remains whether the current dispute is within the scope of the Arbitration Agreement.

2. <u>Dispute Within the Scope of the Arbitration Agreement</u>

The FAA creates a presumption in favor of arbitrability. <u>Paladino v. Avnet Comp. Techs., Inc.</u>, 134 F.3d 1054, 1057 (11th Cir. 1998).   Accordingly, any doubts concerning the scope of arbitral issues must be construed in favor of arbitration. <u>Mitsubishi</u>, 473 U.S. at 626.   The Eleventh Circuit has held that if parties intend to exclude categories of claims from their arbitration agreement, the parties must clearly express such intent. <u>Brown v. ITT Consumer Fin. Corp.</u>, 211 F.3d 1217, 1222 (11th Cir. 2000).   In other words, issues will be deemed arbitrable

unless it is clear that the arbitration agreement does not include them.  First Options of Chi., 514 U.S. at 945.

In determining whether the claims fall within the scope of the Arbitration Agreement, the Court examines (a) the text of the agreement as contained within LPL's Master Account Agreement and (b) the eligibility of this dispute under the incorporated FINRA Rules, specifically FINRA Rule 12200.

> *a. Text of Arbitration Agreement Within LPL's Master Account Agreement*

To determine whether arbitration is valid in this case, the Court must answer whether the Arbitration Agreement is applicable to (i) disputes in general between Plaintiffs and Defendant Benjamin[9] and (ii) the specific disputes raised in this case.

> i. General Disputes Between Plaintiffs and Defendant Benjamin

The Arbitration Agreement covers disputes between "you and LPL and/or your Representative(s) (whether or not a signatory(ies) to this Master Account Agreement or Arbitration Agreement)."  The Parties do not dispute that "you" refers to the client opening the account, which is Dr. Dhaliwal on behalf of the Plan and Plan Sponsor.  The question, then, is whether Defendant Benjamin is Plaintiffs' Representative as that term is used within the Arbitration Agreement.

---

[9] The Court later addresses whether Plaintiffs' claims against Defendant South State will be compelled to arbitration because it is clear Defendant South State was not a direct party to this Arbitration Agreement.

Defendants suggest Defendant Benjamin is Plaintiffs' representative. (Defs.' Mot. to Compel Arbitration, Doc. 17, ¶ 10; see also id. ¶ 17 ("During the time period at issue, Benjamin was a registered representative licensed with LPL Financial and was also employed by South State Bank.").) According to Thomas Barnett, Plaintiffs' LPL Account 3063 "was serviced by Scott Benjamin, an LPL Financial Advisor." (Barnett's Aff., Doc. 17-1, ¶ 6.) In a footnote, Plaintiffs respond, "The term 'Representative' is not defined in the Master Account Agreement but is used in the three LPL documents attached to Mr. Barnett's Affidavit, with no explanation of the meaning of the term. The Agreement is too ambiguous to be enforceable with respect to any alleged 'Representative.'" (Pls.' Resp. Opp'n Defs.' Mot. to Compel Arbitration, at 3 n.2.)

Defendants respond that, first, "Representative" is defined in LPL's Master Account Agreement as the client's "registered representative," and Defendant Benjamin was registered both with FINRA and LPL Financial. (Defs.' Reply Supp. Mot. to Compel Arbitration, at 6 (citing LPL's Master Account Agreement, at 2; Def. Benjamin's FINRA Report, Doc. 30-1, at 1).) Second, in LPL documents pertaining to Plaintiffs' LPL Account 3063, Defendant Benjamin is the account "Representative." In LPL's New Account Form, the "Rep ID" for the account is 3W9D — Defendant Benjamin's Rep ID. (See LPL's New Account Form, at 1, 4; see also LPL's ERISA

Service Provider Disclosure Form, at 1.) Plaintiffs fail to address Defendants' arguments in its sur-reply.

Although it is possible, albeit unlikely, that "Representative" refers to some other individual,[10] Plaintiffs offer no evidence that someone other than Defendant Benjamin was Plaintiffs' "Representative" as that term is used by LPL. Even if what is meant by "Representative" is ambiguous, the "presumption in favor of arbitration applies unless the party opposing arbitration rebuts it." <u>Grand Wireless, Inc. v. Verizon Wireless, Inc.</u>, 748 F.3d 1, 7 (11th Cir. 2014). Given that the Court must reasonably interpret the agreement in favor of arbitration and Plaintiffs fail to rebut that Defendant Benjamin is the only logical "Representative," the Court finds "Representative" refers to Defendant Benjamin.

> ii. Specific Dispute Between Plaintiffs and Defendant Benjamin

Having found that a dispute between Plaintiffs and Defendant Benjamin could fall under the Arbitration Agreement, the Court

---

[10] For example, the term representative could refer to an individual who represents Plaintiffs more generally, such as an attorney. Such an interpretation, however, does not compute with how LPL uses "Representative" as evidenced by LPL's Master Account Agreement, which makes clear that the "Representative" is under LPL's control and limited to representing the client regarding their account. (<u>See</u> LPL's Master Account Agreement, at 3 ("You acknowledge that LPL reserves the right in its sole discretion to refuse or restrict your orders and that LPL may re-assign your account to a different representative . . . ."); <u>id.</u> at 1 ("Do not agree to enter into any other business relationship with your Representative . . . .").)

must determine whether the specific dispute raised in this case falls within the scope of the Arbitration Agreement.

The Arbitration Agreement applies to:

[A]ny controversy between you and LPL and/or your Representative(s) (whether or not a signatory(ies) to this Master Account Agreement or Arbitration Agreement, arising out of or relating to your account, transactions with or for you, or the construction, performance, or breach of this agreement whether entered into prior, on or subsequent to the date hereof.

Broken down to the parts relevant to this case, the scope of the Arbitration Agreement covers "any controversy" between Plaintiffs and Defendant Benjamin if it is one "arising out of or relating to [Plaintiffs'] account[] [or] transactions with or for [Plaintiffs]."

It is clear to the Court that the "account" refers to Plaintiffs' LPL Account 3063, and Plaintiffs make no contrary argument. Thus, the question is whether this dispute is over a controversy arising out of or relating to Plaintiffs' LPL Account 3063 or transactions with or for Plaintiffs.

Courts interpret similar language to that in the Arbitration Agreement as "broad" and "all-encompassing." In re RDM Sports Grp., Inc., 260 B.R. 905, 911 (N.D. Ga. 2001); see also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 398 (1967) (stating that the arbitration clause in question was "broad" by covering "[a]ny controversy or claim arising out of or relating to this [a]greement"). In fact, other courts have stated, "It is

difficult to imagine language broader" than the phrase "any controversy." Levine v. Merrill Lynch, Pierce, Fenner & Smith Inc., 639 F. Supp. 1391, 1397 (S.D.N.Y. 1986).

Plaintiffs' case concerns Defendant Benjamin's management and investments in his capacity servicing the Plan. (Am. Compl., at 1.) Plaintiffs claim that using his discretionary authority over the Plan, Defendant Benjamin acted in ways that benefitted him rather than the Plan. (See, e.g., id. ¶¶ 11-12.) One of the Plan's investment accounts was LPL Account 3063.

"Courts are bound to 'rigorously enforce agreements to arbitrate' consistent with their stated terms." Weiner v. Tootsie Roll Indus., Inc., 412 F. App'x 224, 229 (11th Cir. 2011) (quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221 (1985)). After analyzing the above, the Court cannot state with "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." United Steel Works of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–83 (1960). As such, the Court finds arbitration proper as between Plaintiffs and Defendant Benjamin under the text of the Arbitration Agreement as contained within LPL's Master Account Form.

> b. *Whether the Dispute is Arbitrable Under Incorporated FINRA Rule 12200*

The Court found above that there exists a valid written agreement requiring arbitration of this dispute. Now, the Court

need only examine whether FINRA Rule 12200's remaining requirements are satisfied: (i) "The dispute is between a customer and a member or associated person of a member"; and (ii) "The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company."

> i. Dispute Between a Customer and a Member or Associated Person of a Member

Defendants argue that Plaintiffs are customers and Defendant Benjamin is an associated person of a member. (Defs.' Reply Supp. Mot. to Compel Arbitration, 2.) Plaintiffs disagree.

### I. Customers

FINRA Rule 12100(k) broadly defines the term "customer" in the negative: "A customer shall not include a broker or dealer." There is no contention that Dr. Dhaliwal or the Plan Sponsor, Retina Consultants, P.C. is a broker or dealer. Expanding on the definition of "customer" under FINRA, the Fourth Circuit explained that under FINRA, "arbitrable disputes must arise in connection with the 'business activities' of the FINRA member [or associated person of a member], thus suggesting that for a person to obtain arbitration, the person must be a customer with respect to a FINRA member's [or associated person of the member's] business activities." UBS Fin. Servs., Inc. v. Carilion Clinic, 706 F.3d

319, 325 (4th Cir. 2013). Even applying this requirement, the Court finds Plaintiffs are customers of LPL Financial as evidenced by Dr. Dhaliwal, on behalf of Plaintiffs, opening an account with LPL Financial. Furthermore, Plaintiffs are customers of Defendant Benjamin who was paid to manage and service the Plan, which included LPL Account 3063. As discussed below, LPL Financial is a FINRA member and Defendant Benjamin is an associated person of LPL Financial. Plaintiffs argue they "are not customers of LPL but rather are customers of [Defendant South State] Bank and its affiliate South State Investment Services." (Pls.' Resp. Opp'n Defs.' Mot. to Compel Arbitration, at 2.) Plaintiffs, however, fail to disprove the evidence supporting that they are customers of LPL Financial and Defendant Benjamin.

## II. Associated Person of a Member

FINRA Rule 12100(u) defines the term "person associated with a member" or "associated person" as a "natural person who is registered or has applied for registration under the Rules of FINRA." Plaintiffs continuously claim that Defendant Benjamin is not a member, but Defendants concede he is not; Defendants clearly focus their argument here on Defendant Benjamin being a "person associated with a member." (Compare Pls.' Reply Opp'n Defs.' Mot. to Compel Arbitration, at 4, with Defs.' Sur-Reply Supp. Mot. to Compel Arbitration, at 1, 6 n.5.)

Defendants provide evidence that Defendant Benjamin "has been registered with FINRA since 1997." (Defs.' Reply Supp. Mot. to Compel Arbitration, at 2 n.2.) Furthermore, LPL Financial is a FINRA member firm. (See Def. Benjamin's FINRA Report, at 3, 7.) Defendant Benjamin was associated with LPL Financial as shown by the fact that he was a representative and financial advisor of LPL Financial. (LPL's New Account Form, at 1, 4; Def. Benjamin's FINRA Report, at 7.) Thus, Defendants show that Defendant Benjamin is an associated person of a member. Plaintiffs offer no evidence refuting that Defendant Benjamin is an associated person of a member.

          ii. Dispute Arises in Connection with the Business
              Activities of the Member or the Associated Person

The Eleventh Circuit provides that Rule 12200 is "intended to bind a FINRA member's associated persons to arbitrate disputes only when the dispute arises in connection with the business activities of the associated person undertaken in his or her capacity as an associated person of the FINRA member." Pictet Overseas, Inc. v. Helvetia Tr., 905 F.3d 1183, 1188 (11th Cir. 2018). Continuing, the Eleventh Circuit stated:

> Because a person's status as an associated person depends entirely on his or her relationship or role with the FINRA member, we understand the FINRA Arbitration Code to require an associated person to arbitrate a dispute before FINRA only if the dispute has some connection to the associated person's relationship with the FINRA member.

Id. at 1189.

Here, the dispute is about Defendant Benjamin's servicing of the Plan, which holds an investment account with LPL Financial and Defendant Benjamin is the representative and financial advisor of that investment account. As such, the Court finds the dispute has "some connection" to Defendant Benjamin's relationship with the member firm, LPL Financial. Consequently, Plaintiffs' dispute against Defendant Benjamin satisfies FINRA Rule 12200's requirements. The Court now turns its attention to whether the Court should compel Plaintiffs to arbitrate their claims against Defendant South State.

## C. Compelling Plaintiffs to Arbitrate Claims Against Defendant South State

No party argues that Defendant South State is directly part of the Arbitration Agreement. Defendants argue that "the fact that South State Bank did not sign the [A]rbitration [A]greement does not alter the fact that Plaintiffs must also arbitrate their claims against South State Bank." (Defs.' Mot. to Compel Arbitration, ¶ 14.) Although the general rule is that "arbitration is a matter of contract [and] the FAA's strong proarbitration policy only applies to disputes that the parties have agreed to arbitrate," Klay v. All Defendants, 389 F.3d 1191, 1200 (11th Cir. 2004) (punctuation omitted), there is an exception allowing a nonparty to compel arbitration "if the relevant state contract law

allows him to enforce the agreement," <u>Arthur Andersen LLP v. Carlisle</u>, 556 U.S. 624, 632 (2009).[11] Defendants argue that the Court may compel arbitration of Plaintiffs' claims against Defendant South State under the doctrine of equitable estoppel.[12]

For the question of "whether a non-party can enforce an arbitration clause against a party," "state law provides the rule of decision." <u>Lawson v. Life of the S. Ins. Co.</u>, 648 F.3d 1166, 1170-71 (11th Cir. 2011). As stated above, Georgia law applies. Georgia law recognizes the principle of equitable estoppel in enforcing arbitration agreements under two scenarios. <u>See id.</u> at 1171. First, "when a signatory to the written agreement containing the arbitration clause '"must rely on the terms of the written agreement in asserting its claims" against the nonsignatory,'" the nonsignatory may compel arbitration. <u>BRE/Cocoa Beach Owner, L.L.C. v. Rolyn Cos.</u>, No. 6:12-cv-466-Orl-22GJK, 2013 WL 12159257, at *7 (M.D. Fla. Mar. 6, 2013) (applying Georgia law) (quoting <u>Autonation Fin. Servs. Corp. v. Arain</u>, 592 S.E.2d 96, 100 (Ga. Ct. App. 2003) (quoting <u>MS Dealer Serv. Corp. v. Franklin</u>, 177 F.3d 942, 947 (11th Cir. 1999) *abrogated, in part, on other grounds,* <u>Arthur Andersen</u>, 556 U.S. 624)). Second, the nonsignatory may

---

[11] Defendants note that the Arbitration Agreement that Plaintiffs signed provides for arbitration even against non-signatories. (LPL's Master Account Agreement, at 8.)

[12] Because the Court finds arbitration proper under equitable estoppel, the Court need not address Defendants' argument that principles of agency also allow the Court to compel Plaintiffs to arbitrate their claims against Defendant South State.

compel arbitration "when the signatory to the contract raises allegations of 'substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.'" Id. (quoting Autonation Fin. Servs., 592 S.E.2d at 100 (quoting MS Dealer Serv., 177 F.3d at 947)). Under the second version, if arbitration was not compelled against the nonsignatory, "the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." MS Dealer Serv., 177 F.3d at 947 (quoting Sam Reisfeld & Son Import Co. v. S.A. Eteco, 530 F.2d 679, 681 (5th Cir. 1976)). Defendants employ the second scenario of equitable estoppel, under which, Defendant South State may compel arbitration if Plaintiffs' claims against Defendant South State raise allegations of substantially interdependent and concerted misconduct as those between Plaintiffs and Defendant Benjamin.

In BRE/Cocoa Beach Owner, applying Georgia law, the district court found the claims were intertwined when the plaintiff claimed both defendants had the same duty of care and the elements of the plaintiff's claims against both defendants heavily overlapped. 2013 WL 12159257, at *8. In Autonation Fin. Servs., the Court found the claims against both defendants were "based on the same facts and [were] inherently inseparable" when the individual defendant acted as agent of the business defendant, the two worked

in concert, and the individual defendant profited from the scheme. 592 S.E.2d at 101 (quoting MS Dealer Serv., 177 F.3d at 948).

The Court now examines Plaintiffs' allegations against Defendants Benjamin and South State to determine whether they are based on the same facts. Plaintiffs' initial complaint did not include Defendant South State Bank. (See Original Compl., Doc. 1.) Plaintiffs then amended their complaint to add Defendant South State and referenced Defendant South State's liability only as Defendant Benjamin's employer. (See, e.g., Am. Compl., ¶¶ 1, 5, 8, 11.) The Proposed Second Amended Complaint[13] is more specific about how Defendant South State is liable by including, in the last paragraph of five of the six counts, the allegation that "[a]t all times herein South State Bank failed to supervise and monitor the actions of Benjamin."

After reviewing all allegations and potential allegations Plaintiffs make against Defendants, the Court finds Defendant South State is only liable based on the actions of Defendant Benjamin. Said another way, without the alleged wrongdoings of Defendant Benjamin, there would be no case against Defendant South State. As such, Plaintiffs' claims against Defendant South State are inextricably intertwined with those against Defendant

---

[13] At this time, the Court declines to rule on Plaintiffs' motion to amend their complaint. Out of completeness, however, the Court examines that complaint and finds that even if the Proposed Second Amended Complaint was the operative complaint here, the Court's decision as to Defendants' equitable estoppel claim remains the same.

Benjamin, and Defendant South State may compel Plaintiffs to arbitrate their claims against it.[14]

## D. Stay Pending Arbitration

Defendants request this case be stayed pending arbitration. (Defs.' Mot. to Compel Arbitration, ¶¶ 23-25.) Plaintiffs fail to oppose Defendants request to stay. The FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. Because the Court finds the claims arbitrable, the Court **GRANTS** Defendants' motion as to its request to stay pending arbitration.

### III. CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration and stay pending arbitration (Doc. 17) is **GRANTED.  IT IS HEREBY ORDERED** that (1) the Parties **SHALL ARBITRATE** all claims

---

[14] Furthermore, because Plaintiffs fail to respond to Defendants' equitable estoppel argument, the Court deems the argument unopposed. See State Farm Mut. Auto. Ins. Co. v. Robert Eugene Marshall, 175 F. Supp. 3d 1377, 1385 (S.D. Ga. 2016) (quoting Jones v. Bank of Am., N.A., 564 F. App'x 432, 434 (11th Cir. 2014) ("A party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed.  When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").

raised in this case and (2) this case is **STAYED** pending arbitration. The Parties **SHALL** file a joint status report with the Court every **NINETY (90) DAYS** until the arbitration has concluded.

**ORDER ENTERED** at Augusta, Georgia, this ___19th___ day of March, 2020.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA